And just in case anybody's confused, the chief judge, the presiding judge, always sits in the center. But because I've been brought in and he has all of his papers over there, he's sitting over there. But if there be any doubt, he's the boss. Understood, Your Honor. And I was too lazy to move. May it please the Court. Good morning, Your Honors. My name is Courtney Kramer, and I represent the city of Thornton and William Husk, the appellants in this case and the defendants below. The chief issue before this Court is whether it was clearly established on August 30, 2013, that Husk's conduct in the situation he was presented with was unlawful. It is well established that the denial of qualified immunity must be based on materially similar conduct that courts have determined previously to be unconstitutional. And the prime inquiry is whether a reasonable officer would know that his conduct was unlawful in the situation he confronted. In this case, the district court had to rely on precedent that as of August 30, 2013, put Husk on clear notice that using deadly force under the circumstances he was confronted with would be excessive. In denying summary judgment, the district court relied on three cases, one of which is unpublished, to satisfy the clearly established prong. Contrary to legal precedent, including that recently reemphasized by the Supreme Court in White v. Pauling, these three cases are factually distinguishable and don't constitute clearly established law under the context of this case. None of these cases provided notice to Husk that walking toward an armed criminal suspect with his gun drawn and issuing lawful orders was excessive or unconstitutional. None of these three cases provided notice to Husk that his conduct was reckless, particularly based on the information that he knew when he was responding to the scene and the observations he made when he arrived at the scene. Indeed, these three cases involve officers' responses to suicidal individuals who were known to the officers to be suicidal at the time they received the call and at the time they arrived. That is exactly what the Hastings court decided that Allen and Sevier stood for, and that is not the situation that was before Husk. These three cases are distinguishable for even more reasons, including the reason of the officer's presence on scene, what information was known to the officers upon arrival at the scene, the suspect's behavior, and the danger to officers himself or others. Can you pause there for a second? You said you seem to make the key fact that at least in some of the cases the officers knew the victim, we'll call him suicidal. I don't know if that's true, but don't we know quite a bit here? We know that these officers knew that he had walked away from a hospital the night before. That's fairly significant, and that generally implies mental illness or something along that line. It's significant, I think, at least, and I think we have a district court finding of that effect. Your Honor, the district court did take notice that one of the officers had known that that individual was a walkaway. No, I think it was more than that. The district court said there was radio traffic, which these officers would have heard, indicating that he had walked away from a hospital the night before. Correct. And as the summary judgment briefing establishes, the individual officer who was named in this case did not hear that information. But regardless... He didn't hear the radio traffic on his way to the... Correct. He does not remember hearing that particular information. Did you say he didn't remember it or he didn't hear it? That he did not remember hearing it. Because the district court made a finding. The district court made a finding that... So I think that's a fact found against you. Fair enough, Your Honor. So let's continue, though. There's other facts. The report that he did get also, this officer that actually shot, didn't this officer get the report that the wife said he was acting crazy, use that term crazy, and that she was afraid of him,  Correct, Your Honor. Again, these are all sort of indications of a mental illness situation. When they get there, they talk to the wife and the child. They don't ask much, do they? They don't get much information. And there were a few of his friends that tried to offer information, and there was a... The allegation is that they were told to shut the F up when they tried to provide the officers with information, and then the officers just simply began their approach. I mean, these are all the facts, and they may be controverted, but the district court found them against you. And so I think there's a lot more here than just, you know, this isn't just a report of a domestic violence incident or a report of a violent individual. There's a lot of signs here. And when they get there, they see this gentleman on the driveway shouting at no one in particular, waving about at no one in particular. Again, I'm not sure you can really distinguish those cases. Well, Your Honor, respect from cases where there's a report that they might be suicidal. There is a great distinction, because if there can't be a distinction made, then an officer is going to have to respond to any claim of potential violence or any claim of potential violence. Well, there was no claim of potential violence here. There was a report that the reporting party had been threatened with that day, and that was why she was calling. And that is found in the district court's order. But also the district judge found that Officer Husk did not know that. Thank you, Your Honor. Because it wasn't coded as a domestic violence, right? Correct, Your Honor. But the domestic violence doesn't make as much of a difference. That was one of the facts that was in the briefing. Officer Husk believed that once he learned that there was a female and a male, which often indicates that. What the district court learned or determined was known to Officer Husk at the time that he was responding to a high-priority alert, which is more than simply a welfare check, as was found in the three cases relied on by the district court. High priority indicates that there is more of an emergency situation, the potential for a crime. This suspect was drunk and possibly on drugs, which can include a lot of different behaviors and is not necessarily. But let's slow down. Let's take – each fact is important, I think. Agreed, Your Honor. When we're trying to decide whether the law was clearly established in particular. So there was – this is what the district court found. And so these are the facts. This is what we must deal with here. There was a high – the report was a high-priority disturbance involving a party armed with one or more bats, describing it as a DK, in parentheses, drunk, unwanted party, and a disturbance. There was no report that Sobolos had injured anyone that day. Vigil had told – she did – there is the dispatch had – Sobolos had threatened her with a knife a few months earlier, but this information was placed only in the CAT system. So, yes, you have high-priority disturbance, but you don't have any report of violence. Well, threatening a person with a bat or the fact that the reporting party in this case was calling for assistance with that individual is very distinctive from the three cases the court relied on. I'm confused now. I thought that there was no – the fact that she'd been threatened with a knife a few months earlier wasn't relevant because he didn't know it. Your Honor, in the district court's finding, he found that the reporting party had called for police assistance out of concern for her safety. But what's important is what the officer knew. Right, and the officer knew that the individual had – was drunk, possibly on drugs,  Focus on the threat. But then do we agree, as Judge Morris is trying to establish, that this officer did not know about that event a few months earlier with his wife? I believe that the district court found the officer did know that he had been – No, the information was placed only on the CAD system. About the knife. Officers – Right, correct. And that's what we're talking about, isn't it? However, it was reported to the officer in this case that he had been known to carry knives in the past and that he was currently armed with a bat. Both of those are – Is that in the district court's order? Correct, Your Honor, that he was armed with a bat. It's in the first two pages of the order. That he was armed with a knife. I thought it was a pocket knife and they didn't find that out until afterwards. Correct, Your Honor. Right. Officer Husk was responding knowing that he was armed with a bat. It doesn't have to be a knife. It doesn't have to be a weapon. There's a big difference between a bat and a gun or a bat and a knife. Well, respectfully, Your Honor, the case law doesn't make a distinction in terms of that, particularly in light of what the officer might be faced with when he approaches it. The critical thing is a bat can be lethal, but some of these cases that are cited as precedent, the officers are in confined places. They can't easily escape.  It seems to me that when you've got a bat, which doesn't shoot a projectile long distances away, there is an easy alternative of just backing away. But in all the other cases, they're really a fortiori our case. They said in those cases that the officers were not justified, even though the victims had guns or swords that could be projected long distances. And even in those cases, the court said the officers had to go to trial, but it wasn't clearly established that they were acting constitutionally. And so in our case, it's even worse, because this defendant had no long-distance method of entering these officers. What the distinction is is not just what the officers knew over radio traffic. It's what their observations were at the time and the suspect's response when officers arrived. In all three of those cases, the individuals were subdued. They were not agitated until officers affirmatively did something. They also, for the most part, were complying with commands, just not in complete compliance. Here, as soon as Sabayo saw the officers, he made eye contact with them, refused to comply with commands to drop the weapon or to stop proceeding forward. And instead, he affirmatively defied that and went into the garage outside of the officer's sight. That also indicated that he understood what was going on and was being defiant. Then he continued. As he came out of the garage, officers didn't know what was going on in the garage, if he had maybe gotten another weapon that perhaps was not immediately visible, but he still had the bat in his hand. When he was given, again, lawful commands to drop the bat and stop, he affirmatively responded, which is distinctive from the three cases the court relied on. Instead, he taunted the officers. He said, or what? He used expletives. He puffed his chest. There is case law. But he didn't lunge at them. He didn't run at them. It's still defiant, though, Your Honor, and there's no case law that says an officer can't take action unless somebody runs at you or unless someone lunges at you. That would require an officer to essentially, in every single case, sit back and wait to see what happens. That's the whole point of requiring clearly established law, to provide officers notice with what is or is not. And the Hastings Court specifically limits the notice to dealing with individuals who are known to be suicidal, who are not known to have any indicia of criminal activity, which is a big distinction in this case, who did not refuse to comply with commands, who were there asking for help in terms of dealing with their suicidal tendencies. And those are very big distinctions that you don't have to disagree with the district court's orders because they are in there. And I think another distinction is that in the during oral argument, the district court specifically said that this particular officer did not know why that individual was acting that way. There are a lot of reasons why individuals could act out or why individuals might be acting in an agitated manner, but the court below specifically said there was no reason for Huss to have known that he was asking in the way that he did. In Allen v. Muskogee, was the decedent there known to be suicidal? Yes. The family called because the individual had threatened to commit suicide, was in his car with a gun. Are you thinking that the fact that a person is suicidal is pretty much it? That's the only thing that can create liability? No, Your Honor. I'm kind of bothered by that because a suicidal individual can be just as aggressive as a non-suicidal individual. So isn't it more of a holistic approach? I mean, it's what they see and what they observe and hear. Again, that's why I'm bothered by the fact that they know, according to the district court, that he's a walk away from a hospital the night before, that there's no specific report of violence, and that when they get there, he's walking around yelling to no one in his own driveway, waving a bat at no one. These are not typical, normal actions of a person that they should be concerned about violent behavior. But they might be typical of individuals who are drunk or interested in committing some sort of act. But wouldn't it warrant getting more information, which is what the district court said here? They had opportunities to speak to both his wife and to get more information from these friends, and instead, according to the facts, the friends are told to F off, and the officers immediately approach with guns drawn. And that's what the district court was focusing on here, was the manner in which they approached this individual with very little information that would indicate much of anything. It's a clearly established law that says officers in every single case have to get more information, that they have to wait and stop. It's just part of a factor. But to me, the easily ability to get more information, I mean, nobody was being threatened in the next 30 seconds or a minute by this guy that he was going to do something. Plus the fact that he had a nonlethal weapon, at least from distance, he had a nonlethal weapon. Plus the fact that the officers had an easy method of escape. Those all seem to be factors that ought to be taken into account. And all of these are factors that are easily evaluated with the benefit of hindsight, but that's not what the law permits us to do. It has to be based on what the officer saw at the time. As soon as the officer arrives on scene, he sees a person walking around with a bat in a public area, in a residential area. There's no clearly established law that says that just because nobody is visible right around that person, that there's not going to be a threat to public. The person has walked away from a hospital. In fact, the Huron case, respectfully, Your Honor, it involved an individual who was just known to steal a purse. And the court decided that she – Your Honor, may I briefly finish? Yes. Thank you. The court decided that she acted appropriately in preventing the escape of an individual because she could have been excluded into the public. At any moment, an officer has to evaluate the fact that somebody could be in the general vicinity or that that individual could also be armed with a pocket knife, something that's not visible, and escape, which is why they're trained to contain the situation. And based on the conduct, that's why he had to act. But what makes it unconstitutional is whether the officers under our case law, whether their actions precipitated the use of force. And that seems to be controverted here. And that's my problem. Respectfully, Your Honor, I think you're – We're stuck with the facts as the district court found them. And we look at them in a light most favorable. However, Your Honor, for the second prong, which we are asking you to evaluate this case under the clearly established, you don't have to look as to whether the officer's actions constituted a – or violated a constitutional right, whether it was reckless. We're asking you to look at the three cases the district court relied on and based on the district court's factual findings, establish that there are too many distinctions in order to constitute clearly established law, particularly under White v. Pauling. That's fine. Thank you, Your Honor. Thank you very much. We will hear from Ms. Grossman. Good morning. May it please the Court. My name is Erica Grossman. With Anna Holland Edwards, I represent the family of Jaime Ceballos. In this era of qualified immunity analysis, the issue here is beyond debate. Every reasonable officer knows what the circuit said in Hastings, that Allen and Sevier clearly established that aggressively confronting an armed and suicidal or potentially emotionally disturbed individual who is not a immediate threat to anyone is unreasonable. Let me test that, okay? The two cases that you started with were Allen and Sevier. Now, Sevier was a dismissal for lack of appellate jurisdiction, right? So I don't know how Judge Mage or anybody could find that Sevier clearly establishes anything because all the panel did was dismiss the appeal because under Johnson v. Jones, our court had no jurisdiction. But in Allen and in both Sevier, they discussed what would amount to a constitutional violation and said that the facts as found by the district court would amount to a constitutional violation. So the circuit said in Hastings whether or not they were evaluated. Okay. I've got questions about Hastings and I've got questions about Allen, but focusing on Sevier, how can a court clearly establish the law when the court enunciated no merits holding? All it did was say we have no appellate jurisdiction. Well, it affirmed the district court's holding that it could be a violation that the officer was unreasonable in both using deadly force and his own reckless creation of circumstances in aggressively confronting a disturbed individual. And so in affirming that, saying that that would amount to a constitutional violation, it then becomes a clearly established constitutional violation. No, they didn't affirm the district court. They said we don't have jurisdiction to reverse it. That's totally different. You can't rely on Sevier for a constitutional violation, for finding a constitutional violation unless you can't really rely on it in the clearly established prong. I mean, this Court thinks that you can't rely on Sevier. I think this Court in Hastings said that Allen and Sevier would clearly establish those facts to be aggressively confronting an armed and emotionally disturbed individual to be unreasonable. But if you can't rely on Sevier, then you can also rely on Allen. But, I mean, this Court in Hastings specifically looked at both Allen and Sevier as what amounted to constitutional violations in determining that those cases clearly established it. I mean, it may be that a court could give you dicta about what they think the law is. That's not binding precedent. I don't know whether dicta carries weight for clearly established law or not. I mean, a dicta doesn't establish anything. So if the test is clearly established, dicta doesn't establish, and therefore I guess you would say if it doesn't establish, you can't clearly establish. Well, I would say that Allen v. Muskogee would also clearly establish. Okay, well, but Judge Bacharach is going through these case by case, so maybe we finish. I finished my questions on Sevier. Are you ready to talk about Allen? Okay, so the next one I want to ask you about is Hastings. Now, how can Hastings clearly establish anything because it's not even precedential? It's an unpublished opinion. I understand that. When I was quoting Hastings, I wasn't quoting Hastings to the point that that was clearly established in the law. I was saying that this circuit looked at Allen and Sevier to talk about what was clearly established, and this circuit discussed that it was clearly established in both of those cases. So I'm not saying Hastings then clearly establishes it, but Hastings discusses both Allen and both Sevier as clearly established in the law that aggressively confronting an individual like Jaime Ceballos would be unconstitutional. Okay, so let's get to the third of the three. I know you want to talk about Allen. So as I recall Allen, and tell me if I misremember it, the plaintiff or the decedent is in his car. He's got his right hand holding a revolver or a gun on the console, and he's suicidal. He's not making any movements. And our court says that the district court could reasonably found, at summary judgment, that there were different accounts. One is that the officer that pulled the weapon was very calm and very prudent. And then there was another account that he came up screaming at this suicidal man who was wanting nothing but to kill himself, making no movement with regard to the gun. And then they start yelling at him, exclaiming to him, put it down, put it down. And then another officer goes to the passenger window, and then he raises the weapon, and then the first officer kills him. Well, that seems different than our case in any number of ways, isn't it? I mean, just as in Allen, the district court found here that there was time for Officer Husk to use appropriate de-escalation tactics that he didn't choose to do any. And just as in Allen, Officer Husk here aggressively approached him shouting multiple commands, which the district court found. But Medina says that you don't have to, for Fourth Amendment deadly force cases, you don't have to use the least intrusive use of force. So even if Officer Husk could have used de-escalation techniques, and even if he approached it wrong, I think under a state of larceny, the issue is whether or not it's clearly established that he unreasonably created the need for the use of force, not whether or not he could have done something different. Well, just as in Allen, he recklessly created the need for the use of force by aggressively approaching Ceballos, who was 100 yards away, yelling at no one with his bat in his driveway, and then closing the distance. And just as in Allen, he refused, or just as in Allen, he was yelling multiple commands, and he was recklessly creating the danger. And I want to actually address a point that was said by my colleague in terms of whether Allen was just a welfare check, a suicidal person, he wasn't a criminal suspect. That's just not true. Allen was known to have threatened family members that day and having guns. He had an arrest warrant out. He was, in fact, a criminal suspect. This was not a call where he was just called for, you know, parents are calling for help with their kids. This was a call about a criminal suspect who was known to these officers to have threatened people that day. But he obviously, I mean, he's immobile. He's in the car, surrounded by officers. He obviously did not make any movement toward the officer. He couldn't have. Whereas Mr. Savios affirmatively took at least one step. Now, there's a dispute about whether he moved quickly or slowly, but there's no dispute that he made at least one step toward Officer Huss when he shot him. And just as in Allen, any need or any hostile motions was in direct response to the officer's own conduct of recklessly approaching and creating the need for any force. And Allen, I mean, he shot at an officer, right? So after they came and tried to grab a gun from him, he certainly was aggressive and violent towards the officer. And the key point there was whether or not the officer's own conduct recklessly created the need for any force, which just as in Allen, Officer Huss' conduct did here, as the district court found, in both his refusing to information gather from his friends, in his approaching him aggressively, in closing the distance and standing his ground with a person that he knows is out of his mind and is not going to lawfully respond to in order to drop the bat. What do you mean he knows he's out of his mind? How does he know that? Well, Officer, you know, I want to talk about, you know, there was discussion about what the district court found in respect to Officer Huss' knowledge of Sabaius' compromised mental state, and I wanted to add to that, that Officer Huss, what was before the district court, in addition to his findings, Officer Huss himself testified that he knew that Sabaius was a person in crisis, not acting normal, agitated, acting crazy, on substances, just not right, that he knew that his mental state possibly prevented him from engaging in appropriate and normal behavior, and he may not be able to follow lawful commands. This was the testimony before Judge Maitch, and this testimony and a surfeit of other evidence provided ample support for his findings that Officer Huss knew that Sabaius was, and this is a finding by Judge Maitch, obviously out of control and acting in a bizarre manner, suggesting intoxication or mental illness. And he also found, as you said, a walk away, and that his two friends were trying to calm him down. And this is the circumstances that go to the reckless creation of danger. You know, when you're comparing these cases, it struck me that maybe the test is not whether we find cases that are on all four points with us. I think the test really is are there cases on all four points, or worse, because it doesn't, I mean, I don't think any of these cases are exactly like ours, but at least Allen v. Muskogee might be actually more extreme and still held that the officers should have known that they couldn't have done that. I mean, in Allen v. Muskogee, the officer was faced with a defendant with a gun, which is clearly more dangerous than a baseball bat. Confronted with a guy at close range, just a few feet away, which is clearly more dangerous than a guy in an open driveway where you can easily escape. And yet, in that case, the court said that the officer had not, that there was precedent that established the officer, or I guess that case established the precedent, that the officer could not have responded the way that the officer did. So in our case, it's not on point. It's clearly different. But it's different in an a fortiori way, with less force and less threat. And so the officer is less justified in our case than there. So I find the case relevant, not because it's comparable, but because it is not comparable, but only in an a fortiori way. But I do have one big problem with Allen, which I need to have you explain. Allen focuses on one factor, which I think has largely been discredited, which is that the officers helped provoke the crisis. In fact, Hastings did the same thing. And so did Sevier, or at least Sevier, rather, did the same thing. The Supreme Court has largely discredited that approach, have they not? Hasn't the Supreme Court said that for an excessive force case, we should not take into account whether the officer caused the risk in the first place? That could be a separate constitutional violation that we don't consider when we look at the excessive force. The excessive force looks just at the event at the moment it happens. And was it excessive or not at the moment it happened? If the officer caused that risk, that could be a separate cause of action, but it does not inform the constitutional analysis at the moment of the conflict. Isn't that right? And if so, does that meaningfully distinguish Muskogee? I don't believe a reading of the Supreme Court says that you can't. I understand the idea that you couldn't have separate claims, but the Supreme Court hasn't overturned any idea that you look at the 10th Circuit's approach, which has been the approach for years, that you look at the totality of the circumstances. It has been for years, but it's only been in the last two or four years. Well, it was 2017. You're talking about County of Los Angeles v. Mendez. Yeah. They didn't actually address the provocation. They declined to address the provocation rule. And we reaffirmed in Polly 3, where I concurred, that our precedent recognizes that the reasonableness of the use of force depends not only on whether the officers were in danger at the precise moment, but also whether their actions were reckless or deliberate conduct. So we've reaffirmed that principle post the questioning in Mendez. I didn't think you didn't cite Mendez in your briefs. I didn't cite Mendez. I think it's still our case law. Whether it's eventually going to, you know, hold up, I don't know. My understanding, and I didn't cite it, or my understanding is that Allen v. Muskogee was recently cited in the Polly 3, which would reaffirm the principle that the reckless creation of danger analysis still forms a fundamental part to looking at whether, under the totality of circumstances, deadly force was reasonable. Okay. Somehow, and was that the basis? That was your main question, right, Judge Ebel? Yes, that was it. Okay. I want to also, I have 53 seconds, and I just wanted to address the suicidal point. None of the cases holdings were limited to suicide. And I just want to, if you look at the Allen court, when they allowed a deliberately indifferent training claim against the city to proceed, it was a broader category of people. It was, they said it was common for officers to have to deal with the mentally ill or the emotionally disturbed people and people under the influence of drugs and alcohol. And that's just a broader category of people. It doesn't make sense to cabin this to suicide. You can't expect officers to try to evaluate, hey, is this person having a psychotic episode? Are they suicidal? The question is whether or not you're dealing with unpredictable individuals in a compromised, in a known compromised emotional state who are likely to not act normal, not act rational, or possibly provoke a violent response. And, you know, I'd ask this court to affirm the order in its entirety and let a jury decide whether it was reasonable or not for Officer Huss to shoot and kill High Maids of Iowa's within minutes, in under a minute. Thank you. Thank you. Ellen, I think you fell on the side of time. Is that right? Okay. Thank you. This matter will be submitted. Court is in recess.